IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION

JOHN KIZER,

       Plaintiff,

vs.                        CASE NO. 1:15-cv-242-MP-GRJ

CAROLYN W. COLVIN,
Acting Commissioner of
Social Security

       Defendant.

_____/

## REPORT AND RECOMMENDATION

Plaintiff appeals to this Court from a final decision of the Acting

Commissioner of Social Security (the "Commissioner") denying Plaintiff's

application for a Period of Disability and Disability Insurance Benefits

("SSDI") pursuant to Title II of the Social Security Act ("the Act"). (ECF No.

1.) The Commissioner has answered (ECF No. 9), and both parties have

filed briefs outlining their respective positions. (ECF Nos. 16 &17.) For the

reasons discussed below, it is recommended that the Commissioner's

decision be affirmed.

## I. PROCEDURAL HISTORY

Plaintiff protectively filed his application for SSDI on April 20, 2012,

alleging a disability onset date of December 18, 2011. (R. 77–78.) Plaintiff

alleged that he could longer work due to bulging disc, shoulder surgery,

carpal bones (left hand), pain in the right arm, upper back pain, migraines,

and diabetes. (R. 77–78, 207.) His application was denied initially and

upon reconsideration. (R. 112–22.) Following a hearing on January 17,

2014, an administrative law judge ("ALJ") issued a decision unfavorable to

Plaintiff. (R. 29–42.) The Appeals Council denied Plaintiff's request for

review. (R. 1–4.) On November 4, 2015, Plaintiff filed the instant appeal.

(ECF No. 1.)

## II.  STANDARD OF REVIEW

The Commissioner's findings of fact are conclusive if supported by

substantial evidence. *See* 42 U.S.C. § 405(g) (2000). Substantial evidence

is more than a scintilla, i.e., the evidence must do more than merely create

a suspicion of the existence of a fact, and must include such relevant

evidence as a reasonable person would accept as adequate to support the

conclusion. *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995) (citing

*Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982), *Richardson v.*

*Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971));

*accord Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991).

Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision. *Edwards*, 937 F.2d at 584 n.3; *Barnes v. Sullivan*, 932 F.2d 1356, 1358 (11th Cir. 1991). The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision. *Foote*, 67 F.3d at 1560; *accord Lowery v. Sullivan*, 979 F.2d 835, 837 (11th Cir. 1992) (holding that the court must scrutinize the entire record to determine reasonableness of factual findings); *Parker v. Bowen,* 793 F.2d 1177 (11th Cir. 1986) (finding that the court must also consider evidence detracting from evidence on which the Commissioner relied). However, the district court will reverse the Commissioner's decision on plenary review if the decision applies incorrect law, or if the decision fails to provide the district court with sufficient reasoning to determine that the Commissioner properly applied the law. *Keeton v. Dep't Health & Human Servs.*, 21 F.3d 1064, 1066 (11th Cir. 1994).

The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental

impairment that can be expected to result in death, or has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §§ 416(I), 423(d)(1); 20 C.F.R. § 404.1505 (2005).[1] The impairment must be severe, making Plaintiff unable to do his previous work, or any other substantial gainful activity which exists in the national economy. 42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505–404.1511.

The ALJ must follow five steps in evaluating a claim of disability. 20 C.F.R. §§ 404.1520, 416.920. The claimant has the burden of proving the existence of a disability as defined by the Social Security Act. *Carnes v. Sullivan*, 936 F.2d 1215, 1218 (11th Cir. 1991). First, if a claimant is working at a substantial gainful activity, he is not disabled. 20 C.F.R. § 404.1520(b). Second, if a claimant does not have any impairment or combination of impairments which significantly limit his physical or mental ability to do basic work activities, then he does not have a severe impairment and is not disabled. 20 C.F.R. § 404.1520(c). Third, if a claimant's impairments meet or equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, he is disabled. 20 C.F.R. § 404.1520(d).

---

[1] All further references to 20 C.F.R. will be to the 2005 version, unless otherwise specified.

Fourth, if a claimant's impairments do not prevent him from doing past relevant work, he is not disabled. 20 C.F.R. § 404.1520(e). Fifth, if a claimant's impairments (considering his residual functional capacity ("RFC"), age, education, and past work) prevent him from doing other work that exists in the national economy, then he is disabled. 20 C.F.R. § 404.1520(f).

The burden of proof regarding the plaintiff's inability to perform past relevant work initially lies with the plaintiff. *Walker v. Bowen*, 826 F.2d 996, 1002 (11th Cir. 1987); *see also Doughty v. Apfel*, 245 F.3d 1274, 1278 (11th Cir. 2001). The burden then temporarily shifts to the Commissioner to demonstrate that "other work" which the claimant can perform currently exists in the national economy. *Doughty*, 245 F.3d at 1278 n.2.[2] The

---

[2] In *Doughty* the court explained this burden shifting as follows:

> In practice, the burden temporarily shifts at step five to the Commissioner. The Commissioner must produce evidence that there is other work available in significant numbers in the national economy that the claimant has the capacity to perform.  In order to be considered disabled, the claimant must then prove that he is unable to perform the jobs that the Commissioner lists. The temporary shifting of the burden to the Commissioner was initiated by the courts, and is not specifically provided for in the statutes or regulations.

*Id.* (internal citations omitted).

Commissioner may satisfy this burden by pointing to the Medical-Vocational Guidelines (the "Grids") for a conclusive determination that a claimant is disabled or not disabled. *Walker*, 826 F.2d at 1002 ("[T]he grids may come into play once the burden has shifted to the Commissioner to show that the claimant can perform other work.").

## III.  SUMMARY OF THE RECORD

### A.  Medical Evidence

On February 23, 2009, Plaintiff visited Gainesville Open MRI for an MRI scan of his cervical spine based on a history of right hand pain and numbness as well as an MRI scan of his right shoulder due to a history of right shoulder and arm pain. The MRI of the cervical spine revealed a mild bulging disc at C6-7 without canal stenosis or disc protrusion. The MRI of his shoulder revealed tendinitis versus tendinopathy in the subscapularis tendon and arthrosis in the acromioclavicular joint. (R. 515–16.)

Plaintiff visited Palms Medical Group on October 28, 2011, presenting with back pain and constant tinnitus.[3] He also complained of

---

[3] Plaintiff visited Palms Medical Group for follow-up visits regarding his pain on May 3, 2010, August 16, 2010, March 11, 2011, August 22, 2011, September 12, 2011, and October 18, 2011. (R. 299–305.) The doctor's notes from these visits, however, are illegible.

more recent neck and arm pain, including pain in both elbows and wrists.

During his physical exam, Plaintiff was not in any acute distress, but he

had an active, painful normal range of motion in both shoulders. Plaintiff

presented with a normal gait, requiring no assistive device, although he

had tenderness in his cervical and lumbar spine as well as moderate

lumbar spasm. Plaintiff had a decreased active range of motion in his

cervical spine but not in his lumbar spine. Plaintiff's upper and lower

extremities exhibited normal strength. Plaintiff's assessment included

cervicobrachial syndrome, cervicocranial syndrome, lateral epicondylitis,

sacroilitis, and pain in the thoracic spine. Trigger point therapy was applied

to the cervical/thoracic and/or lumbar spinal regions. During these visits

Plaintiff rated his pain from as low as a 3/10 and as high as an 8/10. (R.

338–40.)

Plaintiff returned to Palms Medical Group multiple times after that

appointment for additional trigger point therapy. He had three

appointments in November 2011, two in December 2011, and one in

January 2012. Although Plaintiff mentioned back, neck, and shoulder pain

and soreness during these visits, he also included details of heavy labor he

had performed during that time period, including unloading trucks,

chainsaw work, and other heavy lifting. On two visits, Plaintiff also reported severe headaches. The results of his physical examinations included tight and tender muscles with joint fixation in the cervical, thoracic, and/or lumbar regions. He often reported that the trigger point therapy gave him at least temporary relief from his pain. (R. 341–54, 422–28.)

On February 10, 2012, Plaintiff had x-rays at Doctors Imaging Group of his cervical and thoracic spine. There were no appreciable cervical spondylitic changes visible. Further, there were very mild thoracic spondylitic changes, predominantly in the mid-and-lower thoracic levels. There was no compression fracture seen. (R. 554.) Plaintiff returned to Palms Medical Group on February 20, 2012, after these x-rays. His physical exam revealed tight and tender muscles with joint fixation in the cervical, thoracic, and/or lumbar regions. The assessment noted uncontrolled diabetes mellitus, type 2, and myalgia/myositis. His medications were aspirin, glipizide, and Lanlus Solostar. (R. 283–84, 298, 452.)

Plaintiff had an MRI of the cervical spine at Gainesville Open MRI on February 29, 2012. This MRI was compared to a previous MRI of the cervical spine taken on February 22, 2009. The impression from this

examination was that there was a C6-7 disc bulge without canal or foraminal stenosis. Further, there was no acute osseous abnormality. (R. 447–48.)

Plaintiff again visited Palms Medical Group almost monthly in 2012. On March 5, 2012, his physical exam yielded similar findings to his last visit. His assessment/plan noted myalgia/myositis, fatigue/malaise, cervicalgia, and uncontrolled diabetes mellitus, type 2. Although Plaintiff's MRI revealed a bulging disk at C6-7,[4] the notes stated that lab results would be considered before referring Plaintiff for interventional treatment options, ex epidural injections, or pain management. His medications changed to include Flexeril. (R. 285–87, 296–97.)

During his April visit, Plaintiff complained of right arm pain. He stated that his right index and middle fingers are stiff and painful and feel swollen in the morning. His physical exam results, however, did not include anything about his right arm, and under "extremities" the result was no edema present. In the treatment plan for his arm pain, the doctor noted trying Ultram. (R. 288–90.)

---

[4] Despite the disc bulge, there was no significant change when compared to the prior examination on February 22, 2009. (R. 297.)

During Plaintiff's visit to Palms Medical Group on May 8, 2012, and June 6, 2012, he complained of neck pain, mostly on his right side but occasionally on the left side. His physical exam, however, stated that his range of motion and hand grip were intact and that there was no edema present. The doctor prescribed lortab for his pain, and Plaintiff was referred to pain management. (R. 291–95, 311–13.)

On July 9, 2012, Plaintiff had an initial evaluation at SIMED, Southeastern Rehabilitation Medicine, for pain management, and he had a follow-up appointment on August 17, 2012. Plaintiff complained of a history of chronic right-side neck pain, right elbow pain, and right shoulder pain. His physical exam revealed pain caused by palpation at the right lateral epicondyle, pain with resisted right wrist extension, pain at the cervical right-sided paraspinals and in all places of the cervical spine with range of motion, and pain with movement of right shoulder. The impressions from this visit were cervicalgia/potential right-sided cervical radiculopathy, right shoulder pain, right lateral epicondylitis, and history of diabetes mellitus type II. Notably, although the MRI of Plaintiff's C spine revealed degenerative changes, they were age-appropriate and not responsible for the pain in his right shoulder and right lateral epicondylitis. The doctor's

recommendation, however, included only physical therapy, beginning Lyrica, an ointment base, and possibly cervical epidural injections in the future.  Notably, the doctor suggested that Plaintiff is not a narcotic candidate given the etiology of his pain.  (R. 484–87, 521–23.)

On October 23, 2012, Plaintiff visited Palms Medical Center complaining of right shoulder pain after he installed a window. His physical exam, however, revealed an intact range of motion. His right shoulder was inferior to his left shoulder, and his posterior right shoulder musculature is flatter/slightly atrophied compared to the left shoulder. The rest of the findings were unremarkable. The assessment/plan noted that Plaintiff did not want to return to pain management because he felt that the doctor was yelling at him and did not believe he was in pain. Plaintiff was told to continue lortab and avoid aggravating factors. (R. 373–76.)

On November 21, 2012, Plaintiff complained of hand and shoulder pain, which was causing numbness in his thumbs. His physical examination revealed Tinel's Sign in his right hand and mild pain with motion. His left hand appeared normal. The doctor determined that Plaintiff may have carpal tunnel. His lortab prescription was increased for his right shoulder and back pain. (R. 378–80.)

Plaintiff returned on January 15, 2013, due to back pain. Plaintiff said that after building a shed ten days prior to this visit, his back hurt and has not improved. He stated that the left side of his back and thigh were tender and that he had numbness on the outside of his left thigh. He did not, however, have any limp. His physical examination revealed tenderness in his lumbar spine and moderate pain with motion, but he did not have any muscle weakness in his legs. He also had decreased sensation on his left lateral thigh and chronic neuropathy on his feet from his diabetes. He was prescribed robaxin and ibuprofen and told to continue lortab. (R. 382–84.)

On January 25, 2013, Plaintiff was admitted to Shands at the University of Florida, complaining of back pain. He described the pain as stabbing and shooting pain that radiates to his left thigh. Overall, he stated that the pain was moderate and that the pain was aggravated by bending, twisting, and certain positions. During his physical exam, he was not under any distress. Plaintiff had a normal range of motion in his neck and back, although he did exhibit tenderness in his lumbar back. His back was not swollen, and all other findings were normal. Plaintiff's x-ray of his lumbar spine did not reveal any acute traumatic abnormality, and there were minimal age-related degenerative changes. Plaintiff was discharged the

same day ambulatory and stable. (R. 316–27.)

Plaintiff returned to Palms Medical Group for a follow-up visit on February 1, 2013. Plaintiff complained of pain, muscle spasms, and numbness in his left leg. Plaintiff also stated that he had not been taking all of his prescribed medications. During his physical examination, he had tenderness in his right shoulder and moderate pain with motion. Plaintiff also had moderate lumbar spasm and limited range of motion. An MRI was needed of Plaintiff's lumbar spine, and he was referred to pain management. He was also prescribed percocet rather than lortab. (R. 385–88.)

On February 18, 2013, Plaintiff stated that his back had not improved. Plaintiff stated that the numbness on the left outside of his thigh had changed. He said that it burned and hurt, making it uncomfortable to sit, stand, and walk. His physical examination revealed severe pain in the lumbar spine with motion as well as muscle spasms. The plan was for Plaintiff to take ibuprofen, gabapentin—which Plaintiff had stopped taking—valium, and percocet. (R. 389–91.)

Plaintiff went to Gainesville Open MRI on March 8, 2013, for an MRI scan of his lumbar spine. The MRI revealed mild to moderate degenerative

disc disease scattered throughout the lumbar spine. At the L4-5 level, there was mild to moderate circumferential disc bulge with small posterocentral disc protrusion. There was also mild ventral thecal sac indentation and mild central canal stenosis. At the L1-2 level, there was disc desiccation and mild disc space narrowing asymmetric to the right. There was also a right posterolateral annual tear with mild right foraminal narrowing, but there was no central canal stenosis. Further, at the T12-L1 level, there was a mild circumferential spondylitic bulge with small posterocentral focal disc bulge and small disc protrusion. There was also slight ventral thecal sac indentation but without prominent overall central canal stenosis. (R. 444–46.)

On April 12, 2013, Plaintiff visited Palms Medical Group and was referred for lower back surgery instead of pain management. Plaintiff also stated that he had trouble with the strength in his arms and neck pain, noting that he drops things. He said that his lower back pain is the worst, that it is painful to walk, and that he cannot sit or stand for long periods of time. He also said that he has pain, cramping, and a fiery sensation in his upper left thigh as well as pain in his right thigh. (R. 392–94.) Later, a

neurosurgeon[5] at Shands stated that he would not schedule Plaintiff for surgery after viewing Plaintiff's MRI. A referral was necessary for Plaintiff to see an orthopedic surgeon instead. (R. 395–96.)

Plaintiff visited the UF Ortho Institute on May 14, 2013. Plaintiff complained primarily of persistent low back pain as well as left lower leg extremity pain, specifically the anterior thigh. Plaintiff described the pain as dull, aching, sharp, and stabbing. During Plaintiff's physical examination, he was able to rise from a seated position, although he did experience pain with lumbar forward flexion when touching his hands to his knees. Plaintiff's lumbar spine, however, showed normal alignment without evidence of fracture or subluxation. Plaintiff was referred to physical therapy and an interventional pain clinic rather than surgery. (R. 477–82.)

Plaintiff told his doctor at Palms Medical Group that an orthopedic surgeon informed Plaintiff that he does not need surgery and instead needs pain management and physical therapy. Plaintiff stated that his back pain is worsening and that he has had pain in his right arm and shoulder. Additionally, although his blood sugar was good, he stated that he has not

_____

[5] The notes at the top of this report state that it was the orthopedic surgeon that declined to see Plaintiff, but the report later says it was a neurosurgeon who refused to schedule Plaintiff. (R. 395–96.)

been eating as well as he should. His physical examination yielded tenderness in the lumbar spine and moderate pain with motion as well as a limp. (R. 398–400.)

On June 18, 2013, Plaintiff complained of neck pain and stiffness and pain in his left arm. He said he was supposed to have physical therapy but he cannot afford it, so instead he does home exercises. The physical examination of Plaintiff revealed an antalgic gait on the left, but he was able to walk heel-to-toe normally. Plaintiff did not have any spasm, and there was no mid-line spinous or paraspinous tenderness, although the sciatic notch was tender on the right. Motion was without pain. One test on the right produced leg pain below the knee, but the other tests were painless and unremarkable, and his range of motion was also pain-free. (R. 402–405.)

Plaintiff then visited UF Pain and Spine Center on July 12, 2013, after a referral for low back pain and neck pain. Although Plaintiff mentioned he could previously deal with his low back pain without any interventions, he stated that he had an acute exacerbation of his low back pain while bending over in January 2013. Plaintiff described his low back pain as sharp, stabbing, and achy. Plaintiff also mentioned a burning

sensation and numbness along his anterior left thigh. In addition to his back pain, Plaintiff also complained of chronic neck pain. He stated that he has sharp low cervical neck pain that radiates to his shoulder as well as pain in his right biceps that prevents him from lifting heavy boxes over his head. Plaintiff, however, had a full range of motion in his upper extremities. (R. 469–75.)

Plaintiff's physical examination during this visit was unremarkable for his neck, and Plaintiff did not appear in any distress. Plaintiff's cervical spine examination revealed paraspinal tenderness on the right and trigger points over the right trapezius muscle. Plaintiff also had pain with extension and rotation in his lumbar spine as well as paramedian tenderness, but he had no abnormalities in his thoracic spine. Plaintiff also exhibited posterior pain and tenderness to palpation over SI joint. His diagnosis was lumbar facet arthropathy, lumbar spondylosis without myelopathy, sacroiliac pain, and cervical spondylosis. (R. 469–75.)

Notably, the doctor stated that Plaintiff's pain condition is best treated with a multidisciplinary approach involving an increase in physical activity, psychological counseling, and a judicious use of pain medications and interventional pain medicine strategies. For his sacroiliitis and lumbar facet

arthropathy, it was recommended that Plaintiff proceed to bilateral Sacroiliac joint steroid injections and bilateral lumbar medial branch blocks. (R. 475.)

On July 19, 2013, Plaintiff returned to Palms Medical Group and complained of continued back pack and neuropathy from diabetes. He also stated he had problems walking, sitting, and laying because of pain. His physical examination revealed an antalgic gait and limp as well as tenderness and muscle spasms around the lumbar spine. There was, however, only moderate pain with motion as well as a decreased range of motion. (R. 406–08.)

Plaintiff visited the UF Pain and Spine Center on July 23, 2013. He stated that he continues to have pain in his low back, buttock, and left anterior thigh. He rated his pain as a 4/10 at rest and 8/10 with movement. His physical examination revealed lumbar spine pain with extension and rotation bilaterally as well as paraspinous tenderness bilaterally. Plaintiff also had bilateral tronchanteric tenderness. His diagnosis was lumbago, sacroiliitis, and nerve pain. Further, his MRI findings revealed an L2-L3 disc herniation. He received an increase in gabapentin as well as steroid injections to address his pain.  (R. 463–67.)

Plaintiff returned to Palms Medical Group on September 6, 2013, and he stated that he had been doing better with injections and that his pain has been less. His physical examination revealed tenderness in the lumbar spine and moderate pain with motion, but everything else was unremarkable. His prescription was changed from percocet to lortab for his pain, but he was currently stable on medications and insulin for his diabetes. (R. 409–12.)

Plaintiff was again admitted to Shands at the UF Pain and Spine Center on September 12, 2013, complaining of pain at a 7/10 while at rest and 10/10 with movement. The diagnosis was acute chronic pain, and a bilateral lumbar medial branch block was performed. Although Plaintiff's pre-procedural pain score was an 8/10, his post-procedural pain score was a 4/10. (R. 328–37.)

Plaintiff returned on September 25, 2013. Plaintiff stated that his pain returned, describing it as a "shooting, stabbing, burning, sharp, aching pain with some numbness radiating down both legs." Plaintiff also mentioned pain in his neck, mid-back, and shoulders. He rated his pain as an 8/10 at rest and 9/10 with movement. During Plaintiff's physical examination, however, Plaintiff was not in any apparent distress, and his motor strength

was normal in all tested muscle groups. Plaintiff had tenderness in the cervical spine and in the thoracic spine bilaterally. Plaintiff also had pain in the lumbar spine with extension and rotation bilaterally. His diagnosis was lumbar facet arthropathy, leg pain, and cervicalgia. Plaintiff was prescribed physical therapy, and it was noted that Plaintiff should proceed to radiofrequency facet denervation of the lumbar spine. (R. 453–58.)

On November 22, 2013, Plaintiff visited Palms Medical Group after a hand injury. During Plaintiff's physical examination, he had a normal range of motion, muscle strength, and stability in all extremities with no pain on inspection. Although Plaintiff received a new treatment for his hand wound, his lower back pain and diabetes were both stable on his current medication. (R. 414–17.)

Plaintiff returned on December 27, 2013, stating that he was having difficulty paying for his medication. Plaintiff was using a cane during this visit. His neck and back movements revealed pain posturing, and he changed positions multiple times during his visit. He did not, however, have cyanosis, clubbing, or edema, and his range of motion was intact.  (R. 418–21.)

During Plaintiff's visit on January 8, 2014, his physical examination

revealed tenderness and reduced range of motion in the thoracic spine as well as tenderness and severe pain with motion in the lumbar spine. The plan following this visit was to maintain a healthy, balanced diet and regular cardiac exercise program, lantus and glipizide for diabetes, and follow-up as scheduled for pain medication for his back. (R. 673–76.)

On February 4, 2014, Plaintiff requested a refill for lortab. Plaintiff stated that he could no longer perform construction work nor could he sit for prolonged periods of time. He stated that he has pain when sitting after ten minutes. Plaintiff walked with a limp and has a cane, and he stated that he has a hard time sleeping as a result of his left shoulder pain. His physical examination, however, revealed that Plaintiff was able to walk normally heel-and-toe. Plaintiff's motion was without pain, crepitus, or any evident instability. Plaintiff experienced pain in his left buttock and SI joint. Most testing did not reveal any back or leg pain, apart from the seated SLR, which produced leg pain on the right below the knee. Plaintiff had a decreased active range of motion but no limiting factors. Plaintiff's bilateral lower extremity strength was normal. As for Plaintiff's low back pain, the assessment was degenerative disc disease and sacroiliitis. Plaintiff also had gait disturbance due to pain and a walker was requested. Plaintiff's diabetes medication remained unchanged at this visit. (R. 692–96.)

## B. Opinion Evidence[6]

### 1. Dr. Desai

Dr. Sharmishtha Desai, a non-examining consultative physician, found Plaintiff partially credible, stating that the severity of the symptoms expressed by Plaintiff are only partially supported by the evidence. In assessing Plaintiff's RFC, Dr. Desai found that Plaintiff could occasionally lift twenty pounds and could lift ten pounds frequently; Plaintiff could stand and/or walk as well as sit for about six hours in an eight-hour workday; frequently climb ramps and stairs and occasionally stoop, crawl, and climb ladders; and should avoid concentrated exposure to extreme cold, humidity, vibration, and hazards. (R. 93–96.)

### 2. Dr. McCormick

Dr. Timothy McCormick performed an orthopedic consultative examination of Plaintiff on February 13, 2014. Plaintiff reported to Dr. McCormick that he has had diabetes for twenty years, for which he is on medication and insulin. Plaintiff did not present a clear history of neuropathy, but he did describe a sensation in his feet. Plaintiff also reported migraine headaches, stating that they occur about three days per

---

[6] The record also contains opinion evidence from Dr. Floegal regarding Plaintiff's RFC. This evaluation, however, is dated July 2014—after the date of the ALJ's decision on April 25, 2014. (R. 901–08.)

week for about one hour in length. Plaintiff stated that he also has tingling in his hands and that he was told he needed to have a carpal tunnel release. (R. 875–76.)

Plaintiff also told Dr. McCormick that he had rotator cuff surgery in 2009 and that he still has some limitations in motion. Although he said that his right shoulder is okay now, he stated that he believed he had muscle atrophy about the right trapezius. Pointing to his right lateral epicondyle, Plaintiff said he had constant soreness in that area and that pressure on that area is painful. Plaintiff stated that problems lifting his right arm caused him to file for Social Security, but he later stated that his right shoulder was okay but that his right hand had a weaker grip. Plaintiff also reported limitations in movement for his left arm. Plaintiff stated that he believed his left shoulder had the same problems as the right shoulder, but he had never had any imaging studies or surgical intervention for problems in his left shoulder. (R. 876.)

Plaintiff also described pain in his neck, back, and legs. Plaintiff described his neck pain as a stinging-type sensation, but he has no history of surgery despite an MRI with findings of a disc bulge at C5-6. Plaintiff stated that his back pain is across the low back area. Plaintiff said that his SI joint injections offered pain relief but had a pressure sensation. Plaintiff

complained that he has sciatica in the right leg that goes to his knee. He stated that if he twists or bends even slightly it can cause discomfort. Plaintiff stated that this happens throughout the day and may happen with standing or changing positions. Plaintiff also stated that in January he had an episode of shocking pains going down the lateral aspect of his left leg and that the leg is now painful to touch. (R. 876.)

During both describing his medical history and his physical examination, Plaintiff demonstrated a high level of pain behavior. Notably, at times during his examination Plaintiff would grab areas that did not correlate clearly with the particular area being tested. Additionally, although Plaintiff moved slowly from sitting to standing and departed the office with a cane, he was able to move around the office without any difficulty and was able to stand on his heels and toes. (R. 877.)

When examining Plaintiff's hands, Dr. McCormick noticed callouses on the palm of his left hand, but Plaintiff stated that he did not know what caused them and later said that they were old. Plaintiff had a normal grip strength and normal dexterity for fine manipulations. When motion testing was performed on Plaintiff's right arm, he suddenly dropped his arm and grabbed his right hand on his left trapezius area, stating it caused him to have a spasm. Notably, Dr. McCormick noted that there was no clear basis

for motions in the isolated right shoulder joint to cause contralateral spasms. When motion testing was done on the left side, Plaintiff grabbed his shoulder at the deltoid area and posteriorly complaining that he experienced pain there. The rest of the motion testing was done passively, and the motions were full. Overall, Plaintiff exhibited full strength without any joint swelling or tenderness. (R. 877–78.)

When Dr. McCormick examined Plaintiff's lower extremities, he found that Plaintiff had a full range of motion except for his right leg. Plaintiff complained of pain during hip extensions and of pain in the back area. Although Plaintiff's left leg motions were full, he grabbed his left hip and complained of pain there. Plaintiff, however, did not have any joint swelling or tenderness. During strength testing, Plaintiff showed cogwheeling throughout the left leg during flexion and extension at the knee joint and the ankle joint. Notably, Plaintiff indicated pain in the quadriceps during motions that would affect the hamstring muscle. Plaintiff also stated that his left hip was bothering him. On the right side, however, Plaintiff only had cogwheeling at the ankle joint with motion testing, not with the knee joint. Scratch testing around the ankles yielded normal results. (R. 878.)

During the examination of Plaintiff's spine, he responded to very light palpation with sudden flinching and drawing away at about the level of T4

on the right side. In the lumbar paravertebral muscles, Plaintiff responded to very light palpatory pressure about the level of L2 and L3 bilaterally. When this same testing was repeated, however, Plaintiff did not have the same response. The rest of Plaintiff's spine examination was normal except for limitations in thoraco-lumbar/trunk motion. (R. 878.)

After the complete examination, Plaintiff appeared distressed and exhibited pain behaviors. When attempts were made at lumbar motions, Plaintiff stated that he could not go any further than 30 degrees. Plaintiff was able to extend 15 degrees, and his lateral motions were full. Additionally, Plaintiff could stand on his heels and toes, but he departed using a cane. Dr. McCormick stated, however, that "due to his high level of pain behavior and questionable, nonorganic findings, I do not have a clear, objective, reproducible basis for use of the cane in this particular individual." (R. 879.)

Further, although Dr. McCormick completed the Medical Source Statement of Ability to Do Work-Related Activities, he stated that his "opinions are limited due to the fact that the pain behaviors and responses demonstrated appear to be inordinate and some responses he demonstrated do not correlate well with the reported underlying condition but are rather overshadowed with inordinate pain behavior responses." (R.

879.)

Dr. McCormick's Medical Source Statement included the following findings. Plaintiff can lift and carry up to 10 pounds frequently, 11 to 20 pounds occasionally, and never anything heavier. Without interruption, Plaintiff can sit for one hour and stand and walk for ten minutes. Out of an eight-hour workday, Plaintiff can sit for seven hours and stand and walk for one hour. Further, Plaintiff does not require a cane. (R. 884–85.)

Additionally, Plaintiff can never reach overhead, but he can perform all other reaching, handling, fingering, feeling, and push/pull motions between occasionally and frequently. Plaintiff can also operate foot controls between occasionally and frequently. The following activities Plaintiff can do between never and occasionally: climb stairs and ramps, climb ladders or scaffolds, balance, stoop, kneel, crouch, and crawl. Notably, Dr. McCormick stated that he was unable to make this determination based on Plaintiff's pain behavior and responses. (R. 886–87.)

As to environmental limitations, Dr. McCormick determined that Plaintiff could tolerate exposure to the following conditions: unprotected heights and moving mechanical parts between never and occasionally; operating a motor vehicle occasionally; humidity, wetness, dust, odors,

fumes, pulmonary irritants, extreme cold, and extreme heat frequently;

vibrations occasionally; and loud noise. Additionally Plaintiff is able to

perform activities like shopping, travel without a companion or assistance,

ambulate with assistance, walk a block at a reasonable pace on rough or

uneven surfaces, use public transportation, climb a few steps with the use

of a single hand rail, prepare a simple meal and feed himself, care for

personal hygiene, and sort, handle, or use papers and files. (R. 888–89.)

## C. Hearing Testimony

At the hearing on January 17, 2014, Plaintiff was 54 years old. He

had a college degree and past relevant work consisting of construction,

labor, truck driving, and installing satellite dishes. (R. 47, 51.)

Plaintiff's attorney representative stated that Plaintiff was limited to

sedentary RFC as a result of his leg pain and back, neck, shoulder, and

arm limitations. She argued that he is incapable of past relevant work,

stating that his exertional limitations consisted of an inability to sustain

appropriate concentration, persistence, and pace. (R. 52–53.)

Before the ALJ asked any questions of Plaintiff, the Vocational

Expert ("VE") had a couple questions regarding Plaintiff's work history.

Plaintiff noted that he participated in radiography training as part of a work

study program at Santa Fe College. Plaintiff stated that he never worked in

radiography for pay. The ALJ then asked one question regarding a job titled Digital Reception Service, and Plaintiff indicated that this involved satellite TV. (R. 53–54.)

Plaintiff's attorney representative then conducted a direct examination of Plaintiff, which revealed the following information. Although Plaintiff can drive, he has problems seeing so he does not drive. During the hour-long trip to the hearing, Plaintiff had to toss back and forth due to left leg pain and swelling. Plaintiff stated that the pain in his left leg gives him the most trouble out of all of his medical impairments. He testified that his upper thigh "burns like it's on fire." He also stated that the swelling creates pain, particularly when he sits. Further, he stated that he has back pain from sitting that involves sharp pains. (R. 55–56.)

Plaintiff testified that he takes pain medication and muscle relaxers when he has back spasms. He stated, however, that the pain medication does not work on the "shocking pain." Sometimes he is able to relieve some of the pressure by getting up and walking around if the pain occurs while he is sitting. He stated that he can only sit for about ten minutes before he feels pressure. (R. 56.)

Plaintiff also testified that he has problems standing for long periods of time. If he does, he sometimes has a shocking feeling down his right

left. He stated that he can stand for about ten minutes as well, further stating that he can switch from sitting to standing about five or six times in an hour. (R. 57.)

Plaintiff also stated that he has problems walking, so he uses a cane to prevent falls. He noted that six weeks before the hearing he fell and crushed his ribs. He testified that he uses his cane every day. Plaintiff also said that he tries to walk around his yard for exercise. (R. 57.)

Plaintiff then stated that he has problems with both of his shoulders. He stated that the muscles on his right side can be very painful, particularly if he is doing some kind of repetitive motion. He also stated that his left should has limited movement before it causes pain. As a result, Plaintiff stated that he is unable to reach overhead. He also has problems reaching outward, stating that he has to use two hands to get his milk out of the refrigerator. He testified that he can probably lift only about eight pounds, if he is able to keep the item close to him, but he cannot lift this amount of weight consistently because his shoulders and neck would have spasms. (R. 57–58.)

Plaintiff also mentioned that the fingers on his left hand sometimes go numb. Also, he sometimes wakes up in the middle of the night with swollen fingers. Plaintiff stated that he sometimes has pain in both of his

elbows, which prevents him from moving them. Further, Plaintiff mentioned that he drops a lot of things due to problems grasping and holding items. (R. 59.)

Due to his limitations, Plaintiff stated that he is not able to bend over because it creates back pain. If Plaintiff bends to the right, he has a shocking pain down the back of his right leg. He did state, however, that he is able to stoop a little but not constantly because he has difficulty getting up due to locking and stiffness in his knees. (R. 61.)

Plaintiff also testified about his medication. He stated that he takes medication for his nerves, particularly the burning in his legs. He said that his legs are particularly sensitive to heat. Plaintiff also stated that he takes Hydrocodone for pain. He also takes medication and insulin for his diabetes, and he stated that his diabetes is not under control. (R. 60.)

As far as daily living, Plaintiff stated that he tries to help his wife with chores around the house. He said he is unable to vacuum because he cannot do the back and forth movement due to spasms in his neck and shoulder pain. He said that he cooks with his wife since he cannot cook alone because he drops things and forgets what he is doing. (R. 61–62.)

Plaintiff then testified that on a good day his pain is a four with medication. Without his medication, Plaintiff stated that his leg pain is so

severe that he sometimes has to go lay down. He then clarified that the problem is his hip joints, which generate pain throughout his legs. (R. 62.)

The ALJ then questioned Plaintiff. He first asked about why Plaintiff stopped working since Plaintiff told a Social Security claims person that he stopped working because he was working a temporary job. Plaintiff clarified, stating that it was also due to his pain. He said that he began having pain in the back of his arms and was no longer able to unload trucks. (R. 63.)

The ALJ then returned to Plaintiff's statements regarding his physical capabilities. Plaintiff stated that he could stand, sit, and walk around each for ten minutes. Plaintiff also stated that he could climb a flight of stairs, although he would not be able to walk up them fast. He also said that sometimes he falls because of pain in his legs and spine. Plaintiff also mentioned that he cannot crouch, but he also mentioned that he can try to crouch but he is not sure how long he would be able to hold that position. He said he wears slip-on shoes because he cannot bend over. He also does not like to kneel, but he can crawl. (R. 65–67.)

Plaintiff also stated that although he cannot reach his arms straight up, he is able to reach out slightly above the shoulders with his right arm. He is also able to hold things in his right hand. He is not able to lift his left

arm up above his shoulder, but he can hold some things in his left hand. He also has some numbness and swelling in some of the fingers on his left hand. (R. 69–70.)

The ALJ then commented about his agreement with Dr. Desai's statement about how the level of severity of Plaintiff's subjective symptoms was not proportional with the objective findings in the file. As a result, Plaintiff asked to be sent to a doctor, so the ALJ stated that an orthopedic CE would be appropriate after the hearing. (R. 70–71.)

Next, the VE testified. The VE first noted Plaintiff's previous work, which consisted of working as a light fixtures assembler, heavy truck driver, construction project manager, satellite communications antenna installer, and a forklift driver. The VE also stated that none of Plaintiff's skills would transfer to sedentary work from his prior work. (R. 72–73.)

The ALJ posed the following hypothetical to the VE: light exertional level; occasionally climb ramps and stairs; never climb ladders, ropes, scaffold; occasionally balance, stoop, kneel, crouch and crawl; bilaterally upper extremities; occasionally reach overhead; avoid concentrated exposure to extreme cold, humidity, vibration, and hazards such as heights and machinery. The VE testified that this hypothetical individual could work as a light fixture assembler or construction project manager. The attorney

representative for Plaintiff asked the VE whether the hypothetical individual would be able to perform these jobs with a sit/stand option, and the VE said no. (R. 73–74.)

The ALJ then asked about the sit/stand option, and the attorney represented that there would be five to ten minutes between shifting between sitting and standing. The ALJ then asked the VE whether there would be any work at all if an individual had to shift between sitting and standing every five to ten minutes. The VE stated that there would be work for that individual, including a silver wrapper, ticket taker, and an order caller. The VE affirmed that these jobs include a completely at-will option to sit or stand, and the VE based this from his experience as a vocational rehab counselor placing people in those types of jobs because the DOT does not recognize sit/stand options. (R. 74–75.)

## D.  The ALJ's Findings

The ALJ determined that Plaintiff had not engaged in substantial gainful activity during the period from his alleged onset date of December 18, 2011, to his date last insured of September 30, 2013.[7] The ALJ found that Plaintiff had the severe impairments of acromioclavicular joint arthrosis

---

[7] Although Plaintiff worked in 2012, earning $980, this work did not produce sufficient earnings to qualify as substantial gainful activity. (R. 34.)

and subscapularis tendinitis of the right shoulder, status post right shoulder surgery in 2009, right lateral epicondylitis, degenerative changes of the cervical spine, degenerative changes of the lumbar spine, and diabetes mellitus. At step three of the sequential evaluation, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments. (R. 34.)

　　With respect to Plaintiff's residual functional capacity ("RFC") at step four of the sequential evaluation, the ALJ determined that Plaintiff retained the RFC to perform light work with the additional nonexertional limitations against climbing ramps and stairs, balancing, stooping, kneeling, crouching, or crawling more than occasionally and against any climbing of ladders, ropes, or scaffolds. Additionally, the ALJ found that Plaintiff is limited to only occasionally performing overhead reaching bilaterally. Further, Plaintiff must avoid concentrated exposure to extreme temperatures, humidity, vibration, and work hazards including unprotected heights and moving machinery. Plaintiff also requires the option to alternate positions between sitting and standing every 5–10 minutes throughout the workday. (R. 35.)

　　Despite Plaintiff's complaints at the hearing level, the ALJ concluded that Plaintiff's medically determinable impairments could reasonably be

expected to cause Plaintiff's alleged symptoms but that Plaintiff's statements concerning the intensity, persistence, and limiting effects of his symptoms were not entirely credible. First, the ALJ noted the inconsistencies in Plaintiff's statements in materials submitted, to his physicians and examiners, and at the hearing. For example, the ALJ stated that although Plaintiff at times stated that he had severe migraines for 2–3 days each week lasting between one hour and the entire day, Plaintiff often failed to mention these headaches or denied having headaches. (R. 36.)

Additionally, the ALJ extensively described Dr. McCormick's objective clinical evidence of symptom magnification during his consultative examination. This pain behavior was inconsistent with the testing, with physical impairments demonstrated during the examination, and with the record. These inconsistences included, *inter alia*, "cogwheeling" weakness on lower extremity strength testing, extreme responses to very light palpation of the spine that were absent during the same test later, unexplainable pain behavior on testing of the bilateral shoulders as Plaintiff reported pain on the opposite side of the limb tested, and the use of a cane despite his normal gait and ability to heel to toe walk during the examination. (R. 36, 40.)

The ALJ determined that Dr. McCormick's opinion was entitled to

less weight than Dr. Desai's opinion, discussed below, because the opinion was based on Plaintiff's subjective statements as well as Plaintiff's inconsistent and non-anatomic pain behaviors. Additionally, Dr. McCormick stated in his opinion that it was of limited value due to Plaintiff's inordinate pain behaviors and responses. As a result, Dr. McCormick's opinion is less supported by the objective medical evidence than the opinion of Dr. Desai. (R. 40.)

Plaintiff's record also fails to include significantly abnormal clinical signs and laboratory findings to support Plaintiff's subjective complaints. Although Plaintiff complained of disabling symptoms, his record shows a normal gait, ability to heel and toe walk, a normal range of motion of the cervical and lumbar spine, normal strength and range of motion in his extremities, and normal neurological examinations. Additionally, Plaintiff's diagnoses included only minor musculoskeletal conditions. (R. 37.)

Plaintiff's treatment was only limited and conservative. It consisted of physical therapy, chiropractic manipulation, a home exercise program, lumbar medial branch block injections, and cervical trigger point therapy. Further, Plaintiff's medications were typically that appropriate for mild-to-moderate pain, and only occasionally was he prescribed opiate pain medications for the treatment of severe pain. Additionally, when Plaintiff

attended the UF Pain and Spine Center, the recommended treatment involved a multidisciplinary approach including increasing physical activity and utilizing pain medications. (R. 38.)

The ALJ found Dr. Desai's medical consultation to be a well-supported medical opinion, so he gave Dr. Desai's opinion the greatest weight. Dr. Desai, a state agency medical consultant, found that Plaintiff would be capable of light exertional work with nonexertional limitations consistent with the ALJ's RFC findings. Further, the ALJ found his RFC limitations supported by Plaintiff's modest degenerative changes of the cervical, thoracic, and lumbar spine; cervical lumbar paraspinal tenderness and pain on range of motion testing of the cervical and lumbar spine; typically normal strength, sensation, range of motion, and joint inspection throughout the extremities; normal range of motion of the lumbar spine; and preserved range of motion of the cervical spine. (R. 37–40.)

With regard to Plaintiff's alleged cervical and low back pain, the ALJ noted that Plaintiff did not complain of pain to his physicians to the extent he complained of it during his hearing. In fact, on multiple occasions Plaintiff complained of only moderate pain. Further, Plaintiff's MRIs of his cervical spine and x-rays of his lumbar spine indicate only minimal degenerative changes, and an MRI of his lumbar spine revealed only minor

abnormalities. When Plaintiff presented for examinations, there were typically only minimal abnormalities, and he was frequently in no apparent distress. In contrast to his medical history and the record, when Plaintiff had his post-hearing consultative examination—specifically to assess his qualification for disability—he had extreme pain behavior but also inconsistencies suggestive of symptom magnification. (R. 37–38.)

With regard to Plaintiff's alleged severe right shoulder pain and right upper extremity pain, the ALJ noted that Plaintiff's 2009 MRIs revealed only minor abnormalities, and Plaintiff underwent surgical intervention to address these problems. Nothing in the record reveals significant clinical abnormalities of the right shoulder. To the contrary, the record reveals that strength and range of motion of the right shoulder were typically normal. As a result, the ALJ found that the objective medical evidence does not corroborate Plaintiff's complaints of right shoulder and upper extremity pain so as to warrant any limitations in addition to those the ALJ included in his RFC findings. (R. 39.)

With regard to Plaintiff's alleged severe headaches, the ALJ found that Plaintiff failed to consistently complain of these during his medical appointments. No doctor diagnosed Plaintiff with migraine headaches definitively, and no doctor prescribed anti-migraine medications to Plaintiff.

The record instead reveals that Plaintiff complained only occasionally of moderate headaches, which were secondary to his cervical pain. Accordingly, the ALJ found that the objective medical evidence reveals that Plaintiff only experienced modest and occasional headaches, which were essentially only an extension of his cervical pain. As such, Plaintiff's complaints were not sufficiently credible so as to warrant any limitations beyond those in the ALJ's RFC determination, which included a consideration of Plaintiff's partially credible complaints regarding cervical pain and headaches. (R. 39.)

Because of the inconsistencies mentioned above and Plaintiff's inconsistent work history and earnings record even prior to the alleged onset of disability, the ALJ only credited Plaintiff's statements regarding his condition to the degree that the objective medical evidence and well-supported medical opinion evidence corroborates them. Using that standard, the ALJ found that Plaintiff has remained capable of performing work within the RFC determined by the ALJ at all times since the alleged onset date. (R. 37.)

The ALJ determined at step four that although Plaintiff has past relevant work, Plaintiff is unable to perform any of it based on the testimony of the VE and the fact that Plaintiff's past relevant work requires

a medium exertional level or above and does not allow for a sit/stand

option. Considering Plaintiff's age, education, work experience, and RFC,

however, the ALJ determined that there are jobs that exist in significant

numbers in the national economy that Plaintiff can perform. Accordingly,

the ALJ concluded that Plaintiff has not been under a disability from

December 18, 2011, the alleged onset date, through September 30, 2013,

the date last insured. (R. 40–42.)

## IV.  DISCUSSION

Plaintiff raises two arguments on appeal: (1) substantial evidence

does not support the ALJ's finding that Plaintiff is capable of light work

because no examining physician determined that Plaintiff could meet the

physical demands of work requiring him to be on his feet for six hours a

day, five days a week; and (2) the ALJ's decision violates the pain

standard. (ECF No. 16.)

## A. Substantial evidence supports the ALJ's finding that Plaintiff is capable of light work regardless of whether an examining physician determined that Plaintiff could work on his feet for six hours a day, five days a week.

Plaintiff argues that substantial evidence does not support the ALJ's

finding that Plaintiff is capable of light work because no examining

physician opined that Plaintiff could meet the physical demands of work

requiring Plaintiff to be on his feet six hours a day, five days a week.

Further, Plaintiff asserts that Dr. McCormick's opinion establishes that

Plaintiff's limited range of motion of his lumbar spine results in pain that

limits Plaintiff to working in a sedentary occupation eight hours a day, five

days a week. Plaintiff says that Dr. McCormick was the only examining

physician who rendered an opinion regarding Plaintiff's RFC and that

because Plaintiff is not his patient, Dr. McCormick has no reason to

exaggerate his findings or opinions. Additionally, Plaintiff argues that the

record does not contain substantial evidence contrary to Dr. McCormick's

opinion that Plaintiff should be limited to sedentary work. (ECF No. 16.)

    As to Plaintiff's specific concern that an examining physician did not

make a determination of Plaintiff's RFC consistent with the ALJ's RFC

determination, such an opinion by an examining physician is not

necessary. The ALJ has the responsibility of determining a Plaintiff's RFC;

it is not a medical assessment. *See* 20 C.F.R. §§ 416.946(c),

416.927(d)(2); *see also Cooper v. Astrue*, 373 F App'x 961, 962 (11th Cir.

2010) (noting that "[t]he task of determining a claimant's ability to work is

within the province of the ALJ, not a doctor"). Accordingly, the ALJ does

not need an examining physician's opinion regarding Plaintiff's RFC before

making his own assessment of Plaintiff's RFC; instead, the ALJ can make

this determination based upon a review of the medical and other evidence, including the opinions of Dr. Desai and Dr. McCormick. Additionally, if an examining physician does opine about Plaintiff's RFC, the ALJ can still determine that Plaintiff possesses a different RFC, particularly where—as in this case—the examining physician states that his opinion is of limited value. *See Sryock v. Heckler*, 764 F.2d 834, 835 (11th Cir. 1985) (nothing that "the ALJ is free to reject the opinion of any physician when the evidence supports a contrary conclusion" (quoting *Oldham v. Schweiker*, 660 F.2d 1078, 1084 (5th Cir. 1981))).

The ALJ properly made a determination of Plaintiff's RFC, taking into account medical evidence in the record as well as the opinion evidence from Dr. Desai and Dr. McCormick, crediting these opinions as the ALJ determined was consistent with the medical evidence. Additionally, the ALJ provided adequate reasons for his RFC determination, including support from the record and reasons for discrediting both Plaintiff's subjective statements and the opinion of Dr. McCormick.

Specifically, Plaintiff argues that the opinion of Dr. McCormick, an orthopedic consultative examiner, states that Plaintiff's limitations are more restrictive than those that the ALJ determined. Because Dr. McCormick was the only examining physician to opine about Plaintiff's RFC, Plaintiff

argues that substantial evidence does not support the ALJ's RFC

determination, which differed from that of Dr. McCormick. Rather than

revealing that Plaintiff is more limited than the ALJ determined, however,

Dr. McCormick's opinion reveals that Plaintiff's subjective statements as to

his pain and limitations were exaggerated. As a result, Dr. McCormick's

opinion regarding Plaintiff's RFC is not an accurate depiction of Plaintiff's

limitations.

Dr. McCormick highlighted many inconsistencies and exaggerations

in his opinion. Notably, Dr. McCormick stated, "At times he would grab

areas that I could not correlate clearly with the particular area in which

testing was being performed." During a test on Plaintiff's right arm, he

suddenly dropped his arm and grabbed his left side, to which Dr.

McCormick stated, "I do not have a clear basis for motions in the isolated

right shoulder joint to cause contralateral spasms." Plaintiff also stated he

had pain in the quadriceps area when testing was done on the hamstring.

Further, Plaintiff responded with pain behavior to "very light palpation," but

when the same testing was again performed, "the same response was not

elicited." Additionally, although Plaintiff left with a cane, Dr. McCormick

stated, "due to his high level of pain behavior and questionable, nonorganic

findings, I do not have a clear, objective, reproducible basis for use of the

cane." (R. 877–79.)

The ALJ is not required to rely on Dr. McCormick's opinion. Where a "physician expresses uncertainty as to his own medical findings, the ALJ has no obligation to defer to his opinion." *Mason v. Comm'r of Soc. Sec.*, 430 F. App'x 830, 832 (11th Cir. 2011); *see also Edwards v. Sullivan*, 937 F.2d 580, 584 (11th Cir. 1991) ("If a treating physician is unsure of the accuracy of his findings and statements, there is certainly no legal obligation for the ALJ to defer to the treating physician's report."). Here, Dr. McCormick expressed uncertainty about his opinion. He stated, "My opinions are limited due to the fact that the pain behaviors and responses demonstrated appear to be inordinate and some responses he [Plaintiff] demonstrated do not correlate well with the reported underlying condition but are rather overshadowed with inordinate pain behavior responses." (R. 879.) Accordingly, the ALJ afforded Dr. McCormick's opinion limited weight, expressing his reasons for doing so.

Dr. McCormick also based his opinion on Plaintiff's subjective complaints. Where an opinion is "based primarily on the claimant's subjective complaints of pain," the ALJ may discount the opinion. *Freeman v. Barnhart*, 220 F. App'x 957, 960 (11th Cir. 2007). Dr. McCormick stated, "The opinions given are based upon the available information at this time,

including the history given by the examinee . . . . It is assumed that the

information provided to me is correct." (R. 879.) This statement evinces his

reliance on subjective complaints, although it is unclear how much Dr.

McCormick relied on these subjective complaints in comparison to the

medical records. Thus, for these reasons and the many others stated in the

ALJ's opinion, the ALJ was justified in reaching a conclusion different from

Dr. McCormick's RFC opinion.

Although the ALJ determined that the limitations stated by Dr.

McCormick were not supported by the record and afforded his opinion

limited weight, the ALJ determined that Dr. Desai, a non-examining state

agency medical consultant, wrote a well-supported opinion. Where the ALJ

determines that a non-examining physician's opinion is more strongly

corroborated by the record, the ALJ may rely on a non-examining

physician's opinion over that of an examining physician. *See Wilkinson v.

Comm'r of Soc. Sec.*, 289 F. App'x 384 (11th Cir. 2008). Thus, because

the ALJ determined that Dr. Desai's opinion was more strongly supported

by the record than Dr. McCormick's opinion, the ALJ appropriately afforded

this opinion the greatest weight. Dr. Desai, like the ALJ, determined that

Plaintiff could perform light exertional work.

Notably, Plaintiff fails to cite substantial evidence from the record that

contradicts the ALJ's findings as to Plaintiff's RFC or the weight the ALJ

gave to the opinion evidence. Additionally, Plaintiff fails to address the

other evidence from the record—in addition to the opinion evidence—that

the ALJ noted in support of his RFC findings, including conservative and

routine treatment, complaints of only moderate pain, inconsistent

complaints to physicians, non-acute and minimal abnormalities based on

testing, and recommendations of increased physical activity and a

multidisciplinary approach to pain management. All of this constitutes

substantial evidence that supports the ALJ's findings. A mere conclusory

allegation that substantial evidence does not support the ALJ's RFC

determination is not sufficient, particularly without a showing that

substantial evidence supports a finding contrary to that of the ALJ. The

Court therefore concludes that the ALJ did not err and that substantial

evidence supports the ALJ's findings.

## B. The ALJ did not violate the Eleventh Circuit's pain standard.

Plaintiff argues that the ALJ violated the Eleventh Circuit's

credibility/pain standard. According to Plaintiff, Dr. McCormick's describes

Plaintiff's severe limitations for standing and walking due to his chronic

pain. As a result, Plaintiff argues that substantial evidence does not

support—nor could a reasonable person find—that Plaintiff is capable of

spending six hours a day either standing or walking, noting that the ability to stand and/or walk for six hours a day, five days a week is a basic requirement for light work. Further, because the ALJ is required to articulate reasons for discrediting a Plaintiff's subjective testimony of pain, the ALJ's lack of analysis of Plaintiff's credibility in light of Dr. McCormick's examination results and RFC opinions requires reversal and remand. (R. 16.)

A claimant may establish his disability through his own testimony of pain or other subjective symptoms.  *See Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005); *Foote v. Chater*, 67 F.3d 1553, 1560–61 (11th Cir. 1995).  The ALJ must consider a claimant's testimony of pain and other subjective symptoms where the claimant meets the Eleventh Circuit's three-part "pain standard."  *See Foote*, 67 F.3d at 1560.  Under that test, evidence of an underlying medical condition must exist.  *Id.*  If that threshold is met, then there must be either objective medical evidence that confirms the severity of the alleged pain or symptoms arising from the underlying medical condition, or evidence that the objectively-determined medical condition is of such a severity that it can reasonably be expected to give rise to the alleged pain or symptoms.  *Id.*  A claimant's subjective testimony supported by medical evidence that satisfies the pain standard is

sufficient to support a finding of disability.  *Id.* at 1561.

If the record shows that the claimant has a medically determinable impairment that could reasonably be expected to produce his symptoms, the ALJ must evaluate the intensity and persistence of the symptoms in determining how they limit the claimant's capacity for work.  20 C.F.R. § 404.1529(c)(1).  In doing so, the ALJ considers all of the record, including the objective medical evidence, the claimant's history, and statements of the claimant and his doctors.  *Id*. § 404.1529(c)(1)–(2).  The ALJ may consider other factors, such as: (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of the claimant's pain or other symptoms; (3) any precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of the claimant's medication; (5) any treatment other than medication; (6) any measures the claimant used to relieve his pain or symptoms; and (7) other factors concerning the claimant's functional limitations and restrictions due to his pain or symptoms.  *Id.* § 404.1529(c)(3).  The ALJ then will examine the claimant's statements regarding his symptoms in relation to all other evidence and consider whether there are any inconsistencies or conflicts between those statements and the record.  *Id.* § 404.1529(c)(4).

If the ALJ decides not to credit the claimant's testimony as to his

subjective symptoms, the ALJ must articulate explicit and adequate

reasons for doing so or the record must be obvious as to the credibility

finding. *See Foote*, 67 F.3d at 1561–62. While the ALJ does not have to

cite particular phrases or formulations, broad findings that a claimant was

credible and could work are, alone, insufficient for the Court to conclude

that the ALJ considered the claimant's medical condition as a whole.  *Id*. at

1562.  The ALJ's articulated reasons must also be supported by

substantial evidence. *Jones v. Dep't of Health & Human Servs*., 941 F.2d

1529, 1532 (11th Cir. 1991).  The Court will not disturb a properly

articulated credibility finding that is supported by substantial evidence.

*Foote*, 67 F.3d at 1562.  The failure to articulate reasons for discrediting a

claimant's subjective testimony, however, requires that the testimony be

accepted as true and becomes grounds for remand where credibility is

critical to the outcome of the case*.  Id.*

     In this case, the ALJ determined that Plaintiff has medically

determinable impairments that could reasonably be expected to produce

his symptoms, and therefore the ALJ evaluated the intensity and

persistence of Plaintiff's symptoms in determining how they limit his

capacity for work, as reflected in the records and hearing testimony.  *See*

20 C.F.R. § 404.1529(c)(1)–(2).  The ALJ found that Plaintiff's statements

concerning the intensity, persistence, and limiting effects of her symptoms were not fully credible because they were inconsistent with the objective medical evidence.  (R. 36–40.)

Contrary to Plaintiff's assertion, the ALJ pointed to medical and opinion evidence that supports his conclusions regarding Plaintiff's credibility.  *See* 20 C.F.R. § 404.1529(c)(2).   For example, the ALJ pointed to the contradictions between Plaintiff's complaints in the record compared to those at the hearing, including Plaintiff's inconsistent complaints about migraine headaches. The ALJ also noted the absence of abnormal clinical signs and laboratory findings that would support the full credibility of Plaintiff's complaints. Instead, as the ALJ found, the record includes several essentially normal clinical findings and diagnoses of only relatively minor musculoskeletal conditions, contradicting the credibility of Plaintiff's complaints. Further, the medical record evidences that Plaintiff received only routine and conservative treatment,[8] rather than treatment,  which would be expected if Plaintiff's complaints were credible. Additionally, the record includes evidence of an inconsistent work history and earnings

_____

[8] Plaintiff's treatment consisted of physical therapy, chiropractic manipulation, home exercises, lumbar medial branch block injections, and cervical trigger point therapy. Additionally, his medication prescriptions were typically for that of mild-to-moderate pain. (R. 38.)

record, even prior to the alleged onset of disability. (R. 36–38.) *See Sheldon v. Astrue*, 268 F. App'x 871, 872 (11th Cir. 2008) ("A doctor's conservative medical treatment for a particular condition tends to negate a claim of disability."); *see also Schaal v. Apfel*, 134 F.3d 496, 502 (2d Cir. 1998) (noting that poor work history may be evidence of Plaintiff's poor credibility).

The ALJ also highlighted other inconsistencies with the medical record that undermine Plaintiff's credibility. Plaintiff failed to consistently complain to his physicians about the disabling back pain Plaintiff testified about during the hearing. Plaintiff's MRIs and x-rays also reveal only minimal abnormalities and degenerative changes. Then, at his post-hearing consultative examine specifically for disability purposes, Plaintiff mentioned and exhibited extreme pain behavior. Further, Plaintiff's complaints of severe right shoulder and upper extremity pain are not supported by the record, which instead reveals that strength and range of motion for the right shoulder were typically normal. The same is true of Plaintiff's complaints of severe headaches.  The record discloses that Plaintiff only occasionally complained of moderate headaches and was never prescribed anti-migraine medication. Accordingly, because Plaintiff's complaints are not corroborated by the medical evidence in the record, the

ALJ appropriately found that Plaintiff was only partially credible. (R. 37–39.)

In addition to the medical evidence the ALJ relied upon to support his determination regarding Plaintiff's credibility, the ALJ specifically addressed and relied upon the inconsistencies and symptom magnification evident in Dr. McCormick's examination and opinion. Plaintiff's complaints were inconsistent throughout the examination, and his pain response behavior did not always correlate with the testing performed. Plaintiff's credibility was also undermined during the examination because he exhibited extreme pain responses to very light palpation of the spine, and this same response was absent when the same testing was performed later on. Additionally, Plaintiff used a cane when leaving the examination, but Dr. McCormick could not determine a medical reason why Plaintiff would require a cane as he was able to walk normally during the examination. In short, Dr. McCormick's examination yielded evidence of symptom exaggeration, undermining Plaintiff's credibility. (R. 36.) *See Moore v. Barnhart*, 405 F.3d 1208, 1213 (11th Cir. 2005) (stating that the ALJ properly considered Plaintiff's credibility in light of magnified pain behaviors).

In sum, Plaintiff points to nothing specific in the medical records that undermines the ALJ's conclusion that Plaintiff's complaints regarding the

limiting effects of his impairments were not fully credible in view of his

diagnoses, conservative treatment, contradictions and inconsistencies, and

inordinate pain behaviors.  On this record, the Court concludes that the

ALJ did not err in his assessment of Plaintiff's credibility , which finding is

fully supported by substantial evidence.  *Foote*, 67 F.3d at 1562.

## V.  RECOMMENDATION

In view of the foregoing, it is respectfully **RECOMMENDED** that the

decision of the Commissioner should be **AFFIRMED**.

**IN CHAMBERS** on the 30th day of December 2016.

*s/Gary R. Jones*

GARY R. JONES
United States Magistrate Judge

## NOTICE TO THE PARTIES

**Objections to these proposed findings and recommendations must be filed within fourteen (14) days after being served a copy thereof. <u>Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.</u> A copy of objections shall be served upon all other parties. If a party fails to object to the magistrate judge's findings or recommendations as to any particular claim or issue contained in a report and recommendation, that party waives the right to challenge on appeal the district court's order based on the unobjected-to factual and legal conclusions. *See* 11th Cir. Rule 3-1; 28 U.S.C. § 636**.